# United States Court of Appeals
## For the Eighth Circuit

_____

No. 25-1862
_____

United States of America,

*Plaintiff - Appellee*,

v.

Donavan Jay White Owl, also known as DJ,

*Defendant - Appellant*.
_____

Appeal from United States District Court
for the District of North Dakota - Western
_____

Submitted: February 13, 2026
Filed: July 30, 2026
_____

Before COLLOTON, Chief Judge, BENTON and KELLY, Circuit Judges.
_____

COLLOTON, Chief Judge.

Donavan White Owl was charged with felony murder and arson within Indian Country. *See* 18 U.S.C. §§ 2, 81, 1111, 1153. White Owl later pleaded guilty to a lesser offense of voluntary manslaughter, and the more serious charges were

dismissed as part of a plea agreement. At sentencing, the district court[*] found that White Owl did not qualify for a two-level reduction for acceptance of responsibility under the sentencing guidelines, and varied upward from the advisory guideline range of 87 to 108 months' imprisonment to impose the statutory maximum term of 180 months. White Owl appeals the sentence, and we affirm.

Although the case was ultimately resolved by guilty plea, the facts were largely developed in a pre-trial hearing on a motion to suppress, reports of two interviews of White Owl's wife that were submitted in connection with the motion to suppress, and a jury trial that ended in a mistrial. We recite some of that evidence here.

The evidence presented at trial showed that on the night of April 3, 2019, White Owl and his wife Tera Cooke attended a bonfire with Cody Serdahl and Winnifred Smith. The bonfire was at a cabin owned by Serdahl's mother in Mandaree, North Dakota. At the time of the bonfire, White Owl, Cooke, Serdahl, and Smith lived in the cabin.

During the gathering, White Owl argued with Cooke. Seeking to avoid White Owl until he calmed down, Cooke hid in the back of their vehicle. Unaware that Cooke was hiding in the vehicle, White Owl drove away. Shortly thereafter, the cabin burned down, and Smith was killed in the fire.

The government presented circumstantial evidence at trial to show that White Owl set the fire. Serdahl testified that White Owl previously had accused his wife of having an affair and had expressed a desire to kill his wife. A forensic chemist

---

[*]The Honorable Daniel Mack Traynor, then United States District Court Judge for the District of North Dakota, now United States Circuit Judge for the Eighth Circuit.

testified that burned materials from the home and one of White Owl's boots tested positive for gasoline.

Cooke's interviews with FBI agents, which were the subject of a pretrial motion to suppress, included statements not presented at trial. Cooke told investigators that she hid in the back of their vehicle after White Owl accused her of having an affair with Serdahl. After White Owl drove from North Dakota to Montana, he discovered that Cooke had been hiding in the vehicle. Cooke told the FBI agents that after White Owl discovered her in the vehicle, he said that he thought she was inside the cabin, so he poured gasoline through the bedrooms, kitchen, stairs, and deck.

At White Owl's trial, the government called twenty-five witnesses and introduced 207 exhibits. But the district court declared a mistrial based on a dispute over the defendant's access to information about a witness for the prosecution.

White Owl then pleaded guilty to voluntary manslaughter. In accordance with a plea agreement, the government moved to dismiss the felony murder and arson charges. The government also agreed "to recommend a 2-level downward adjustment for acceptance of responsibility, provided Defendant has demonstrated a genuine acceptance of responsibility."

In a presentence investigation report, the probation office described its interview with White Owl:

> When asked to describe what happened on the day of the fire and Ms. Smith's death, the defendant stated he and his wife had left town for a couple's getaway in Montana. He explained he knew nothing about the fire until they returned, which is when his brother told him what happened. He assumed the home burned down due to electrical issues. When asked if he poured gasoline on the residence and lit it on fire with

the intent to kill his wife, he denied any involvement. Donavan was adamant he and his wife were not in the state of North Dakota when the fire occurred. He further asserted Tera lied to investigators when she told them they fought the night of the fire. Donavan asserted her statements were "drunken lies," and the Government tricked her to say those things during the trial.

In addition to Tera's false statements, Donavan advised while he has been detained a friend, Justin Nelson, who was also incarcerated with him awaiting federal sentencing for drug offenses, informed him a third party, Casey Carman, admitted to committing the arson and was willing to testify on Donavan's behalf at trial. When asked why he pled guilty if he was not involved in the offense, he stated he signed the papers, which he "hardly read," because it was "what he had to do to get out of jail." He explained he only pled guilty to avoid a lengthier sentence. After the Probation Officer read the factual basis of the Plea Agreement and explained to the defendant the requirements for the Court to accept his guilty plea and for the Probation Office to apply a reduction for acceptance of responsibility, he stated, "Yeah, I did that. What you just read, I did."

In light of these statements, the probation office declined to recommend a reduction for acceptance of responsibility under USSG § 3E1.1. The probation office recommended a guideline range of 87 to 108 months' imprisonment.

Before sentencing, the district court notified the parties that it believed the guideline range was "inadequate" to satisfy the purposes of sentencing under 18 U.S.C. § 3553(a). The court stated that it was "considering varying upward to a statutory maximum sentence of fifteen (15) years of imprisonment based upon the facts in the PSIR, those that came out at trial, and the other factors under 18 U.S.C. § 3553(a)."

At sentencing, the district court found that White Owl had not accepted responsibility under USSG § 3E1.1, adopted the probation office's recommended guideline range, varied upward from the range under § 3553(a), and sentenced White Owl to fifteen years' imprisonment. The district court explained that the advisory guideline sentence of fewer than ten years' imprisonment would be insufficient to account for the offense conduct that killed Winnifred Smith. The court stated, "I heard enough of the evidence to conclude that essentially Mr. White Owl committed what is essentially a felony murder in this case."

On appeal, White Owl first contends that the district court erred at sentencing when it denied a two-level downward adjustment for acceptance of responsibility under USSG § 3E1.1. Entry of a plea of guilty, combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct, "will constitute significant evidence of acceptance of responsibility." USSG § 3E1.1, comment. (n.3). But "this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility," and a defendant who pleads guilty "is not entitled to an adjustment under [§ 3E1.1] as a matter of right." *Id*. A district court's factual determination about whether the defendant accepted responsibility is entitled to great deference, and this court will reverse only if the finding is so clearly erroneous as to be without foundation. *United States v. Spurlock*, 495 F.3d 1011, 1014 (8th Cir. 2007).

At sentencing, a probation officer stated that during an interview for the presentence report, White Owl denied responsibility for the fire. The officer said that White Owl "was very clear that he and his wife were not in the state of North Dakota when the fire happened so he, you know, did not have anything to do with the fire." The probation officer further stated that White Owl said the government had "tricked" his wife into providing incriminating statements against him, and that he was pleading guilty just to get out of jail.

White Owl does not deny that he made those statements, but he contends that the district court "mischaracterized" his position. White Owl contends that the inconsistencies between his admissions of guilt and statements during the probation office interview were due to gaps in his memory caused by intoxication. White Owl and his counsel advanced a similar argument at sentencing. Counsel claimed that White Owl "was trying to explain . . . that he didn't remember the things that necessarily resulted in the fire but he was taking responsibility for that because he voluntarily became intoxicated and believes that he did those things but can't put them in his mind where they happened."

The district court rejected this characterization. The court determined that "Mr. White Owl has not expressed the proper remorse for Ms. Smith's death and he informed the probation officer that he only pled guilty to get out of jail, even though there is much more significant evidence in this case to convict Mr. White Owl of second degree murder." The district court was in the best position to assess the credibility of the witnesses and to gauge whether White Owl showed remorse and accepted responsibility for his actions. In light of the probation officer's statements at sentencing, we see no clear error in the district court's finding that White Owl's had not accepted responsibility under § 3E1.1.

White Owl next argues that the district court erred by relying on facts inconsistent with his guilty plea when it varied upward from the guideline range. A district court commits a procedural error by "selecting a sentence based on clearly erroneous facts." *Gall v. United States*, 552 U.S. 38, 51 (2007). But a district court is not limited to facts admitted in a guilty plea. "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. A district court "may consider relevant information without regard to its admissibility under the rules

of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." USSG § 6A1.3(a), p.s.

White Owl challenges the district court's finding that he "poured gasoline in the house and he set it on fire intending to kill his wife, Ms. Cooke." He also disputes the court's reliance on findings that White Owl "accused [his wife] of cheating on him with Cody Serdahl," "had been physically violent with her which frightened her," and "[b]egan yelling that he was going to kill [his wife]."

While it is true that White Owl did not admit these facts when pleading guilty to voluntary manslaughter, there was sufficient evidence of record to support the district court's findings at sentencing. At the abbreviated trial, evidence showed that White Owl had previously accused his wife of having an affair and had expressed a desire to kill her. A forensic chemist testified that burned materials from the home tested positive for gasoline. Evidence also showed that one of White Owl's boots tested positive for the presence of gasoline.

The reports of the FBI's interviews with White Owl's wife, submitted as exhibits in connection with the pretrial hearing, also support the district court's findings. In an interview with investigators, Cooke stated that White Owl yelled at her during the bonfire and accused her of having an affair with Serdahl. Cooke also stated that while she was hidden in the back of their vehicle, White Owl yelled that he was going to kill her. White Owl told Cooke that he decided to pour gasoline around the cabin because he thought she was inside. Cooke also informed the agents that she was sometimes afraid of White Owl, and that he physically hurt her in the past. The district court did not abuse its discretion when it determined that Cooke's statements to the FBI in the aftermath of the fire were sufficiently reliable to consider at sentencing. *See United States v. Cassidy*, 6 F.3d 554, 557 (8th Cir. 1993); USSG § 6A1.3, p.s. The district court's findings of fact in support of an upward variance were not clearly erroneous.

White Owl next contends that his sentence is unconstitutional because the district court increased the sentence above the advisory guideline range based on a finding that White Owl set the fire intending to kill his wife. White Owl did not raise a Sixth Amendment objection at sentencing, so we review only for plain error. To obtain relief, he must show an obvious error that affected his substantial rights and seriously affected the fairness, integrity, or public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732 (1993).

The Sixth Amendment requires that any fact that increases the defendant's maximum penalty be admitted by the defendant or found by a jury. *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). Although White Owl's guilty plea authorized a statutory maximum sentence of fifteen years' imprisonment, he relies on Justice Scalia's suggestion that if a particular sentence would be substantively unreasonable with regard to § 3553(a) but for the existence of a fact found by the sentencing judge, then imposition of that sentence would violate the Sixth Amendment. *See Gall*, 552 U.S. at 60 (Scalia, J., concurring). The Supreme Court, however, has not so held; in light of the remedial holding in *United States v. Booker*, 543 U.S. 220 (2005), White Owl's proposed conclusion is not beyond reasonable dispute for purposes of plain error review. *See Cunningham v. California*, 549 U.S. 270, 310 (2007) (Alito, J., dissenting) ("[T]he Court's remedial holding in *Booker* . . . necessarily stands for the proposition that it is consistent with the Sixth Amendment for the imposition of an enhanced sentence to be conditioned on a factual finding made by a sentencing judge and not by a jury."). Nor has White Owl established plainly that it would be substantively unreasonable for a district court to impose the statutory maximum term of fifteen years' imprisonment for White Owl's manslaughter offense even without the additional facts cited at sentencing. We therefore conclude that there is no plain error warranting relief on this claim.

White Owl also challenges his sentence as substantively unreasonable with regard to 18 U.S.C. § 3553(a). He argues that the district court disregarded mitigating

factors and overemphasized retribution when it varied upward from the guidelines range. We review this question under a deferential abuse-of-discretion standard. *Gall*, 552 U.S. at 51. Where a sentence is outside the advisory guidelines range, we "may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Id.*

The district court considered the statutory factors and made an individualized assessment based on the facts presented. The district court considered "the entire file in this matter, the statements of counsel, and the statements of Mr. White Owl," in addition to the sentencing guidelines and the § 3553(a) factors. Mitigating factors were discussed in White Owl's sentencing memorandum and by defense counsel at the sentencing hearing. The district court considered these statements and acknowledged White Owl's need for treatment. In varying upward, however, the court relied on the seriousness of the offense, which resulted in the death of Winnifred Smith, and White Owl's lack of remorse. These are appropriate factors to consider, and the sentence is not unreasonable with regard to § 3553(a) in light of the serious offense conduct and the defendant's failure to accept responsibility.

The judgment of the district court is affirmed.

_____